UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

R. ALEXANDER ACOSTA, SECRETARY
OF LABOR, UNITED STATES
DEPARTMENT OF LABOR,

   Plaintiff,

v.         Civil Action No. 2:16-cv-03491

TEAM ENVIRONMENTAL, LLC,

   Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

   Pending are four motions: (1) plaintiff R. Alexander Acosta's, Secretary of Labor, United States Department of Labor, (the "Secretary") motion to exclude the expert report and testimony of Donald Nestor ("Mr. Nestor"), filed June 16, 2017; (2) the Secretary's motion to exclude the expert report and testimony of Kevin A. Highlander ("Mr. Highlander"), filed October 5, 2017; (3) the Secretary's motion for partial summary judgment, filed September 21, 2017; and (4) defendant TEAM Environmental, LLC's ("Team") motion to defer consideration of the Secretary's motion for partial summary judgment or, alternatively, to stay, filed October 5, 2017.

I. Factual and Procedural Summary

The following summary is taken from the record, read in the light most favorable to the nonmoving party, Team.  Team is a West Virginia corporation with its principal place of business at 50 Simmons Drive, Millwood, West Virginia.  (Mot. Partial Summ. J., Ex. E ¶¶ 1-2.)  Team provides inspection services for companies in the natural gas industry.  (Id. ¶ 4.) Gas companies typically do not have enough inspection work to justify hiring inspectors of their own, so they contract with Team to supply inspectors for specific jobs.  (Deposition of Dennis Weekley ("Weekley Dep.") 13-16, 18, 32; Mot. Partial Summ. J., Ex. E ¶ 1.)  Team's inspectors ensure that its clients' projects comply with the clients' specifications as well as government regulations, such as those promulgated by state departments of transportation.  (Weekley Dep. 50.)  It employs between 80 and 110 people depending on job demand, (Id. 23, 31-32), and has job sites in West Virginia, Ohio, and Pennsylvania.  (Id. 53-54, 62.)  From 2012 to 2016, its gross annual income increased from about $10 million to about $25 million.  (Deposition of Randy Heatherington ("Heatherington Dep.") 38-39.)

The wages that Team paid its inspectors for a specific job were governed by bidding contracts called requests for

2

quotes or requests for pricing (together, "RFP"). (Weekley Dep. 36-37.) Gas companies send RFPs to contractors like Team that then bid on how much its inspectors will get paid for a particular job. (Id. 37-38; see id. 143.) Team's practice was to pay its employees a flat "day rate," which means it paid its inspectors a set amount each day. (Id. 140, 142.) Generally, RFPs permitted Team to pay an inspector the day rate even if the inspector did not work the full day for reasons such as inclement weather, personal issues, and holidays. (Id. 44, 53-44, 81-81, 226-28; Deposition of Guy Sayre, Jr. ("Sayre Dep.") 63-64.) Under some RFPs, Team's inspectors were guaranteed payment of the day rate regardless of whether they actually worked at all on a given day. (Id. 80, 82, 158, 168-69, 225-26; Sayre Dep. 96.)

Team's inspectors consistently worked over forty hours each week, and most inspectors worked at least fifty or sixty. (Weekley Dep. 80, 199-200; see Mot. Partial Summ. J., Ex. D.) The common theme under most RFPs was that Team did not pay any overtime. (Weekley Dep. 92-93, 200, 202-03; see Affidavit of Dennis Weekley ("Weekley Aff.") ¶¶ 20-27.) Only one gas company occasionally permitted Team to pay overtime for hours worked over ten per day for a fifty or sixty hour work week. (Weekley Dep. 105-06, 148-49, 156-59, 176-79.) At any rate, many of

Team's employees earned over $100,000 per year.  (Resp. Opp'n Partial Summ. J., Ex. E.)

A complaint concerning Team's overtime policy prompted the Department of Labor to open an investigation in 2014.  (See Resp. Opp'n Mot. Partial Summ. J., Ex. B; Weekley Dep. 92, 100.) Prior to the investigation, Team had no knowledge of whether any of its inspectors should have received overtime pay or whether they were exempt from overtime.  (Weekley Dep. 100-03, 179-80; see Heatherington Dep. 24-25)  Further, Team had never consulted an attorney or an accountant concerning compliance with the Fair Labor Standards Act ("FLSA").  (Weekley Dep. 100-03, 179-80; Deposition of Carson Chenoweth ("Chenoweth Dep.") 29.) Nevertheless, Team was party to at least two third-party service contracts requiring it either to pay "overtime as legally required," (Mot. Partial Summ. J., Ex. G), or to "comply . . . with . . . the Fair Labor Standards Act," (id., Ex. H).

The Secretary filed suit against Team in this court on April 8, 2016, invoking the court's federal question jurisdiction.  On June 22, 2017, the Secretary filed an amended complaint.  The Secretary alleges that Team failed to pay its inspectors overtime for hours worked over forty in a week in violation of section 7 of the FLSA, 29 U.S.C. § 207 (2016).  (Am. Compl. ¶ IV.2.)  Section 7(a)(1) states that

4

> no employer shall employ any of his employees . . .
> for a workweek longer than forty hours unless such
> employee receives compensation for his employment in
> excess of the hours above specified at a rate not less
> than one and one-half times the regular rate at which
> he is employed.

Those found in violation of section 7 "shall be liable to the
employee or employees affected in the amount of their unpaid
minimum wages, or their unpaid overtime compensation, as the
case may be, and in an additional equal amount as liquidated
damages." 29 U.S.C. § 216(b). The Secretary seeks, inter alia,
payment of unpaid overtime compensation, liquidated damages
pursuant to the FLSA, and injunctive relief.


II. Motion to Defer Consideration and, Alternatively, to Stay


Federal Rule of Civil Procedure 56(d) provides that

> [i]f a nonmovant shows by affidavit or declaration
> that, for specified reasons, it cannot present facts
> essential to justify its opposition [to a motion for
> summary judgment], the court may . . . defer
> considering the motion . . . .

Rule 56(d) motions should be granted with liberality. McCray v.
Md. Dep't of Transp., 741 F.3d 480, 484 (4th Cir. 2014).
"Generally speaking, 'summary judgment [must] be refused where
the nonmoving party has not had the opportunity to discover
information that is essential to his opposition.'" Harrods Ltd.
v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir.

2002) (alteration in original) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 250 n.5 (1986)).

Team asks the court to defer consideration of the
Secretary's motion for partial summary judgment so it can
complete discovery related to the gas industry standard of using
the day rate method of compensation.  (See Mem. Supp. Defer or
Stay 5.)  Team argues that compliance with industry standards is
relevant to defending against the imposition of liquidated
damages under the FLSA.  (See id.)  As later noted herein during
the discussion of the proposed testimony of defendant's expert,
Donald Nestor, additional evidence of an industry standard of
pay methods would not change the court's decision to grant the
Secretary's motion for summary judgment on the issue of
liquidated damages.  Thus, the discovery Team seeks to complete
is not "essential to [its] opposition."  Harrods Ltd., 302 F.3d
at 244.

Alternatively, Team moves for a stay of this action.
"[T]he power to stay proceedings is incidental to the power
inherent in every court to control . . . its docket."  Landis v.
N. Am. Co., 299 U.S. 248, 254 (1936).  This power is not
unlimited: "proper use of this authority calls for the exercise
of judgment which must weigh competing interests and maintain an
even balance.  The party seeking a stay must justify it by clear

and convincing circumstances outweighing potential harm to the party against whom it is operative." Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983) (internal quotations and citations omitted).

Team insists that this action should be stayed pending the Supreme Court's grant or denial of the petition for a writ of certiorari in E.I. DuPont de Nemours & Co. v. Smiley, docket number 16-1189. That petition presents the following question:

> Does the FLSA prohibit an employer from using compensation paid to employees for non-compensable, bona fide meal breaks that it included in their regular rate of pay as a credit against compensation owed for work time?

Petition for Writ of Certiorari at ii, Smiley, No. 16-1189. Team argues that, although the present action "does not involve the issue of credit for meal breaks, it does involve the issue of whether [Team] is entitled to a credit for payments to employees . . . for idle and weather days not worked." (Mem. Supp. Defer or Stay 9; accord Reply Supp. Defer or Stay 11.) Thus, according to Team, its liability "hinge[s] on the same exact determination of law under Section 7(h)(1) of the FLSA" as the employer's liability in Smiley. (Reply Supp. Defer or Stay 11; accord Mem. Supp. Defer or Stay 10.) The Secretary responds that the question presented in Smiley is constrained to meal breaks. (Resp. Opp'n Defer or Stay 6.) Even if the court finds

that <u>Smiley</u> is apposite here, the Secretary argues that the outcome of <u>Smiley</u> pertains to damages, which is not at issue in the pending motion for partial summary judgment. (<u>Id.</u> 7.)[1]

The court agrees with the Secretary: <u>Smiley</u> bears on the present case, if at all, only to the extent of calculating overtime compensation owed, i.e. damages. The pending issue on the Secretary's motion for partial summary judgment is limited to liability. Team has consequently failed to produce "clear and convincing circumstances" that a stay is warranted. The motion for a stay is denied.

### III. Motion for Partial Summary Judgment

#### A. Applicable Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

---

[1] The Secretary also argues that <u>Smiley</u> would have only a nominal effect on the damages in this case. (<u>See</u> <u>id.</u> 7-8.) As the Secretary has noted, damages are not at issue.

law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725 (2nd ed. 1983)).

Regarding genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The moving party has the initial burden of "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). If the movant carries its burden, the non-movant must demonstrate that "there is sufficient evidence favoring [it] for a jury to return a verdict" in its favor. Anderson, 477 U.S. at 249 (citation omitted); see also Dash, 731 F.3d at 311. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Dash, 731 F.3d at 311

(citing <u>Anderson</u>, 477 U.S. at 252, and <u>Stone v. Liberty Mut.
Ins. Co.</u>, 105 F.3d 188, 191 (4th Cir. 1997)).


    B. Discussion


        Section 7 of the FLSA requires employers to pay their
employees overtime "at a rate not less than one and one-half
times the regular rate at which he is employed" for all hours
worked over forty in a given week.  29 U.S.C. § 207.  Failing to
do so subjects an employer to liability for the amount of
overtime compensation owed plus "an additional equal amount as
liquidated damages."  <u>Id.</u> § 216(b).  The Secretary moves the
court for entry of summary judgment that Team (1) failed to pay
overtime in violation of the FLSA and (2) must pay liquidated
damages. (Mem. Supp. Partial Summ. J. 1-2.)  Team evidently
agrees that it violated the FLSA, at least with respect to some
of its employees. (<u>See</u> Resp. Opp'n Partial Summ. J. 7.)
However, Team insists that partial summary judgment should be
denied because there are genuine disputes of material fact
regarding the number of its employees exempt from the FLSA's
protections and whether it acted in good faith and under a
reasonable belief of compliance with the FLSA. (<u>Id.</u> 6-7, 12-
13.)  Each issue will be considered in turn.

To begin, "[t]he Secretary agrees that the amount of back wages owed to each inspector is in dispute" depending on the number of exempt employees. (Reply Supp. Partial Summ. J. 4.) But the Secretary insists that the exemption inquiry is properly suited for factual resolution at trial alongside damages for the amount of overtime compensation owed, which are not at issue in the pending motion for partial summary judgment. (See id. 3-6.) The court agrees. As noted, Team tacitly, if not explicitly, admits that it failed to pay overtime in violation of the FLSA: "[Team] asserts a majority" – but not all – "of the employees for which [the Secretary] is asserting a claim on behalf of are 'exempt' under the FLSA." (Resp. Opp'n Partial Summ. J. 7.) Accordingly, inasmuch as there is no disagreement that Team at least nominally violated section 7 of the FLSA, the Secretary's motion for partial summary judgment that Team failed to pay overtime in violation of the FLSA is granted.

Next, the Secretary seeks summary judgment that Team is liable for liquidated damages equal to the amount of overtime compensation owed, whatever that amount may be. (See Mem. Supp. Partial Summ. J. 12-15.) The award of liquidated damages "[is] the norm for violations of [section] 7 of the [FLSA]." Mayhew v. Wells, 125 F.3d 216, 220 (4th Cir. 1997). The Fourth Circuit

in McFeeley explained the policy behind imposing liquidated

damages:

> This provision for liquidated damages is an additional
> penalty on non-compliant employers.  If an employer
> were instead liable for only unpaid wages and overtime
> pay, it might roll the dice by underpaying employees,
> reasoning all the while it would be no worse off even
> if the employees eventually prevailed in court.

825 F.3d at 245.  The Portal-to-Portal Act provides, however,

that a district court may deny liquidated damages "if the

employer shows to the satisfaction of the court [1] that the act

or omission giving rise to such action was in good faith and [2]

that he had reasonable grounds for believing that his act or

omission was not a violation of the [FLSA]."  29 U.S.C. § 260.

"'[G]ood faith' and 'reasonable grounds' are both measured

objectively, . . . and," although the statute appears to require

the establishment of both elements, which most often will go

hand in hand, the Fourth Circuit directs that "establishing

either element is sufficient to satisfy the statute."  Calderon

v. GEICO Gen. Ins. Co., 809 F.3d 111, 132 (4th Cir. 2015)

(citing 29 C.F.R. § 790.22(c) and Mayhew, 125 F.3d at 220).[2]

---

[2] In their briefing corresponding to the Secretary's motion to
exclude the report and testimony of Mr. Nestor, the parties
debate the proper standard for mitigating liquidated damages in
the Fourth Circuit.  (See Resp. Opp'n Exclude Nestor 6; Reply
Supp. Exclude Nestor 6-7.)  The court finds, however, that the
Fourth Circuit in Calderon has set forth the applicable
standard.

The Secretary contends that Team failed to take any "affirmative action to ensure compliance with the [FLSA]." (Mem. Supp. Partial Summ. J. 12.)  The Secretary highlights the fact that, despite provisions in at least two of its contracts with gas companies that reference overtime and the FLSA, Team never internally discussed the FLSA nor consulted with an attorney or an accountant about FLSA compliance.  (Id. 12-13.) For these reasons, the Secretary argues that Team should pay full liquidated damages.  (See id. 13.)

Team counters that the Secretary's view is too narrow. It asserts that courts approach an employer's good faith and reasonable belief under a "totality of the circumstances" analysis.  (Resp. Opp'n Partial Summ. J. 16-17.)  Thus, Team urges the court to consider a variety of other purportedly mitigating factors as follows: the day rate method of compensation without overtime is standard in Team's industry; Team reasonably assumed that the industry standard of pay was legal; Team is family-owned and relatively small; employees in the industry "expect[], request and inquire[] if they [will] be" paid a day rate; and gas companies imposed upon Team the day rate method of compensation.  (Id. 18.)  Implicitly, Team argues that no affirmative action towards compliance is necessary if

there are sufficient additional mitigating factors evincing good faith or reasonable belief. (Id. 16-18.)

Review of the case law in the Fourth Circuit indicates some support for Team's totality-of-the-circumstances argument. However, the court notes a clear, critical distinction among the cases, absent peculiar circumstances: only those employers who take conscious and proactive steps to comply with the FLSA are found to have acted in good faith and reasonable belief, while those who do not must pay liquidated damages. Compare, e.g., Perez v. Mountaire Farms, Inc., 650 F.3d 350, 375-76 (4th Cir. 2011) (affirming denial of liquidated damages where employer did not act "willfully" for purposes of the FLSA's statute of limitations and sought the assistance of an attorney on FLSA compliance), Roy v. Cty. of Lexington, 141 F.3d 533, 548-49 (4th Cir. 1998) (affirming denial of liquidated damages where employer did not act "willfully" for purposes of the FLSA's statute of limitations, relied upon assistance of legal counsel on FLSA compliance, generously compensated its employees, and provided its employees with some explanation on its compensation scheme), and Burnley v. Short, 730 F.2d 136, 140 (4th Cir. 1984) (affirming denial of liquidated damages where the FLSA's coverage of employer was "transitory and marginal," covering employer for one of the ten years employer was in business, and

14

where employer relied upon an industry newsletter to stay
abreast of the FLSA), with McFeeley, 825 F.3d at 245 (affirming
grant of liquidated damages during period where employer simply
assumed that its employees were not covered by the FLSA based
upon prior practices and "made no effort to look into the law or
seek legal advice").  But see Mayhew, 125 F.3d at 220-21
(affirming denial of liquidated damages based on factors
pertaining to the peculiarities of the employee at issue, who
owned a dog that the employee also used as a tracking dog in
service of his employer).[3]  In some cases, the Fourth Circuit
found decisive alone the establishment of conscious and

---

[3] The Fourth Circuit case of Brinkley-Obu v. Hughes Training,
Inc., also provides some superficial support that conscious and
proactive steps towards compliance are not always necessary to
mitigate liquidated damages under a totality of the
circumstances analysis.  See 36 F.3d 336, 357-58 (4th Cir.
1994).  Although not relied upon by Team, it merits discussion
on this issue.  Brinkley-Obu arose under the Equal Pay Act.  Id.
at 342.  In affirming the denial of liquidated damages, the
court recounted the following factors: the employer looked to an
industry-wide study on pay rates to support its pay practices,
the employee received occasional merit pay-raises, and the
employer's misconduct was not willful for purposes of the FLSA's
statute of limitations.  Id. at 357.  The court noted that
"[n]one of this evidence negates" liability under the Equal Pay
Act, "but it was evidence on which the district court could base
a finding of good faith" without abusing its discretion.  Id. at
357-58.  In the same breath, however, the court cast doubt on
its own reasoning, suggesting that "the more appropriate
inquiry" for the employer was to ascertain whether it was in
compliance with the Equal Pay Act.  Id. at 357 n.37.  This
statement comports with the overwhelming authority on good faith
and reasonable belief in the Fourth Circuit.  Thus, when weighed
against itself and against FLSA jurisprudence in this circuit,
Brinkely-Obu provides specious support for Team.

15

proactive steps, such as consultation with legal counsel.  See McFeeley, 825 F.3d at 245 (affirming denial of liquidated damages after point when employer sought assistance of counsel on understanding the FLSA); Calderon, 809 F.3d at 132-33 (affirming denial of liquidated damages where employer internally reviewed its compliance with the FLSA "multiple times").

        To be sure, the Fourth Circuit's view comports with that of its sister circuits.  See, e.g., Steele v. Leasing Enters., Ltd., 826 F.3d 237, 246 (5th Cir. 2016) ("We have also held that good faith requires a duty to investigate potential liability under the FLSA and that ignorance cannot be the basis of a reasonable belief. (quotations and citation omitted)); Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 942 (8th Cir. 2008) ("To carry his burden, a defendant employer must show that he took affirmative steps to ascertain the [FLSA's] requirements, but nonetheless, violated its provisions."); Martin v. Ind. Mich. Power Co., 381 F.3d 574, 584 (6th Cir. 2004) ("The employer has an affirmative duty to ascertain and meet the FLSA's requirements . . . ."); Alvarez v. IBP, Inc., 339 F.3d 894, 907 (9th Cir. 2003) ("To be insulated from liability under § 259's good faith exception, an employer must show it acted in (1) good faith, (2) conformity with, and (3) reliance on the

16

DOL's regulations or the Administrator's Opinion Letter." (quotations and citation omitted)); Keeley v. Loomis Fargo & Co., 183 F.3d 257, 270 (3d Cir. 1999) ("[R]easonable good faith is not shown when an employer does not inquire about the law's requirements, simply follows an industry trend of not complying with the law, or violates the law in order to remain competitive."); Reich v. S. New England Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997) ("'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development.  It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them."); Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 465 (D.C. Cir. 1976) ("Nor is it enough that it appear that the employer probably did not act in bad faith; he must affirmatively establish that he acted both in good faith and on reasonable grounds.").

     Although arguably stopping short of pronouncing a bright-line rule, the Fourth Circuit in McFeeley signaled contemporaneous, forceful support for the conscious and proactive rule.  In that case, the defendant employers misclassified their employees as independent contractors rather than employees and thus failed to pay the minimum wage required by the FLSA.  McFeeley, 825 F.3d at 239.  Prior to September 2011, the defendants "made no effort to look into the law or

17

seek legal advice," simply "assum[ing] that classification was
appropriate" because "the [employees] had always been
classified" that way.  Id. at 245.  In response to a separate
lawsuit in September 2011, the employer consulted an attorney
concerning FLSA compliance and ultimately "reli[ed] on the
attorney's advice from that point onward."  Id.  The Fourth
Circuit affirmed the district court's decision on liquidated
damages "that defendants had a valid good faith defense after
September 2011 but not prior to that date."  Id.

        The Fourth Circuit in McFeeley found decisive that,
like Team, the defendants prior to September 2011 had never
attempted to ascertain the dictates of the FLSA:

    If mere assumption amounted to good faith and
    reasonable belief of compliance, no employer would
    have any incentive to educate itself and proactively
    conform to governing labor law.

Id.; see also Burnley, 730 F.2d at 140 (stating that "[o]ther
cases have made it clear that an employer may not simply remain
blissfully ignorant of FLSA requirements," comparing it to "an
ostrichlike attitude of self-delusion." (internal quotations
omitted)).  Correspondingly, the Fourth Circuit found that the
defendants acted in good faith and reasonable belief after
September 2011 only because they "proactively conform[ed] to"
the FLSA after that point.  See McFeeley, 825 F.3d at 245.

Team searches for support in two district court cases, Brown v. Nipper Auto Parts & Supplies, Inc., No. 7:08cv00521, 2009 WL 1437836 (W.D. Va. May 21, 2009), and Rau v. Darling's Drug Store, Inc, 388 F. Supp. 877 (W.D. Pa. 1975). Neither are persuasive. In Brown, the Western District of Virginia denied summary judgment for liquidated damages because the employer, "based on his business experience, . . . believed that salaried employees were not due overtime compensation under the FLSA." 2009 WL 1437836, at *4. Thus, although this court may disagree that the employer's actions would suffice under the conscious and proactive standard described above, the employer in Brown, unlike Team, at least believed that he had conformed his pay practices with the FLSA based upon past business experience.

In Rau, the Western District of Pennsylvania denied liquidated damages because the employer was small and had a "close knit relationship" with an employee who sought unpaid overtime. 388 F. Supp. at 887. In addition, the court noted that the employer paid occasional bonuses. Id. These facts showed, according to the court, a lack of "any wilful disregard of the" FLSA and that the employer "desired the [employee] to receive adequate compensation for her very valuable services and devotion." Id. However, Rau may not meet its circuit's mandate: "[a]n employer must affirmatively establish that he

19

acted in good faith by attempting to ascertain the [FLSA's] requirements." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 909 (3d Cir. 1991).  The law in this circuit is not so different that it would disagree.

Simply put, Team has failed to show that it made any conscious and proactive effort to comply with the FLSA.  Indeed, the record shows that the thought never crossed Team's mind, according to its manager:

> So I know it may be hard to fathom being Department of
> Labor employees, but there wasn't a lot of time that I
> spent worrying or being concerned about Fair Labor
> Standards Act.

(Weekley Dep. 13, 101; accord id. 179)  The remaining factors emphasized by Team, without more, are not evidence of the type that show an attempt to comport with the strictures of the FLSA. To that point, the court sees in the record no other facts that could serve to Team's benefit.  In essence, there lacks even a scintilla of evidence that Team made an effort aimed at complying with the FLSA.  Consequently, liquidated damages are appropriate.

Team asks the court to reduce any amount awarded as liquidated damages because "[Team] was not conducting itself in a malicious or oppressive manner."  (Resp. Opp'n Partial Summ. J. 18.)  A predicate to reducing the amount of liquidated damages, however, is a finding of some degree of good faith or

20

reasonable belief in the first place.  29 U.S.C. § 260; <u>Richard</u>
<u>v. Marriott Corp.</u>, 549 F.2d 303, 305 (4th Cir. 1977) ("The
Portal-to-Portal Act . . . does permit the district court, 'in
its sound discretion,' to award a lesser amount of liquidated
damages, or none at all, 'if the employer shows to the
satisfaction of the court that the act or omission giving rise
to such action was in good faith and that he had reasonable
grounds for believing that his act or omission was not a
violation of the [FLSA].'")  Because Team failed to act in good
faith or reasonable belief, the court lacks discretion to reduce
the amount of liquidated damages owed by Team, and the
Secretary's motion for partial summary judgment that Team must
pay liquidated damages equal to its overtime compensation owed
is granted.

## IV. Motions to Exclude Expert Reports and Testimony

### A. Applicable Standard

Federal Rule of Evidence 702 governs the admissibility
of expert witness testimony.[4]  At the threshold, an expert

---

[4] Rule 702 states the following:

A witness who is qualified as an expert by knowledge,
skill, experience, training, or education may testify
in the form of an opinion or otherwise if: (a) the

witness must be "qualified." <u>See</u> Fed. R. Evid. 702.  Rule 702
contemplates a liberal qualification standard for expert
witnesses.  <u>See</u> <u>Kopf v. Skyrm</u>, 993 F.2d 374, 377 (4th Cir. 1993)
(citing <u>Friendship Heights Assocs. v. Koubek</u>, 785 F.2d 1154,
1159 (4th Cir. 1986)); <u>see also</u> <u>Thomas J. Kline, Inc. v.
Lorillard, Inc.</u>, 878 F.2d 791, 799 (4th Cir. 1989).  An expert
witness may be qualified in any one of the five listed ways –
"knowledge, skill, experience, training, or education" – and, in
making the threshold determination, a district judge "should . .
. 'consider the proposed expert's full range of experience and
training,' not just his professional qualifications." <u>Belk,
Inc. v. Meyer Corp., U.S.</u>, 679 F.3d 146, 162 (4th Cir. 2012)
(quoting <u>United States v. Pansier</u>, 576 F.3d 726, 737 (7th Cir.
2009)).

        Once qualified, an expert must offer testimony that
"will help the trier of fact to understand the evidence or to
determine a fact in issue." Fed. R. Evid. 702(a).  Expert
testimony is helpful if the jury needs it to accurately

---

        expert's scientific, technical, or other specialized
        knowledge will help the trier of fact to understand
        the evidence or to determine a fact in issue; (b) the
        testimony is based on sufficient facts or data; (c)
        the testimony is the product of reliable principles
        and methods; and (d) the expert has reliably applied
        the principles and methods to the facts of the case.

Fed. R. Evid. 702.

understand the matter at issue. <u>Kopf</u>, 993 F.2d at 377 ("Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."). Although "the subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend," "an expert witness must possess some specialized knowledge or skill or education that is not in possession of the jurors" in order to cross the line from lay to expert testimony. <u>United States v. Perkins</u>, 470 F.3d 150, 155 (4th Cir. 2006) (quoting <u>Kopf</u>, 993 F.2d at 377, and <u>Certain Underwriters at Lloyd's, London v. Sinkovich</u>, 232 F.3d 200, 203 (4th Cir. 2000)).

Expert testimony must not, however, cross from "[helpful] opinion testimony that embraces an ultimate fact [to] [unhelpful] opinion testimony that states a legal conclusion." <u>Id.</u> 470 F.3d at 158 (first and last alterations in original) (quoting <u>United States v. Barile</u>, 286 F.3d 749, 760 (4th Cir. 2002)); <u>see also</u> <u>Barile</u>, 286 F.3d at 760 ("Expert testimony on an ultimate issue is therefore excludable under Rule 702 if it does not aid the jury."). "Even then, the inadmissibility of the expert's ultimate opinion does not necessarily banish him from the stand altogether, because his specialized knowledge may

still assist the trier of fact in other ways." <u>Kopf</u>, 993 F.2d
at 378.

Last, expert testimony must be (1) "based on
sufficient facts or data" and (2) "the product of reliable
principles and methods," and (3) "the expert [must have]
reliably applied the principles and methods to the facts of the
case." Fed. R. Evid. 702(b)-(d). In other words, expert
testimony must "both rest[] on a reliable foundation and [be]
relevant to the task at hand." <u>Daubert v. Merrell Dow Pharms.,
Inc.</u>, 509 U.S. 579, 597 (1993); <u>see also</u> <u>Kumho Tire Co. v.
Carmichael</u>, 526 U.S. 137, 147 (1999). Five non-exhaustive
factors are germane to the <u>Daubert</u> inquiry:

> (1) whether the particular scientific theory "can be
> (and has been) tested"; (2) whether the theory "has
> been subjected to peer review and publication"; (3)
> the "known or potential rate of error"; (4) the
> "existence and maintenance of standards controlling
> the technique's operation"; and (5) whether the
> technique has achieved "general acceptance" in the
> relevant scientific or expert community.

<u>United States v. Crisp</u>, 324 F.3d 261, 265-66 (4th Cir. 2003)
(quoting <u>Daubert</u>, 509 U.S. at 593-94).

Importantly, the <u>Daubert</u> analysis is "a flexible one."
<u>Daubert</u>, 509 U.S. at 594. Not all of the above factors will be
pertinent to every case, and no one factor is dispositive.
<u>Accord</u>, <u>Kumho Tire</u>, 526 U.S. at 141-42; Fed. R. Evid. 702
advisory committee's notes to 2000 amendments ("<u>Daubert</u> itself

emphasized that the factors were neither exclusive nor dispositive."); see also Crisp, 324 F.3d at 266.  A district court need not "determine that the proffered expert testimony is irrefutable or certainly correct" — "[a]s with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir.2006) (quoting Daubert, 509 U.S. at 596) (alteration in original); see also Maryland Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir.1998) (noting that "[a]ll Daubert demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable . . . and helpful").

### B. Discussion

#### 1. Mr. Nestor

Mr. Nestor is Team's expert witness on the industry standard for compensation methods.  (See Nestor Report ¶ 3.)  In his report, Mr. Nestor states that, based upon his experiences, "there is an ongoing industry standard . . . in which entities compensate their employees under the day rate method of compensation."  (Id. ¶ 21.)  Team intends to offer Mr. Nestor's

25

report and related testimony on industry standards as part of
its defense against the imposition of liquidated damages. (See
Resp. Opp'n Exclude Nestor 1-2.)  The court considered Mr.
Nestor's report when it evaluated the Secretary's motion for
partial summary judgment that Team must pay liquidated damages,
discussed above.  In light of the court's decision granting the
award of liquidated damages, the court finds that Mr. Nestor's
report and potential testimony is unhelpful inasmuch as its
scope is confined to the existence of an industry standard,[5]
which does not appear to bear on any remaining issue in this
action.  Accordingly, the Secretary's motion to exclude the
expert report and testimony of Mr. Nestor is granted.


        2. Mr. Highlander


        Mr. Highlander is Team's damages expert. (See
Highlander Report ¶ 3.)  Specifically, Mr. Highlander "opine[s]
as to the adjustments to be made to the calculations of overtime
allegedly due and owing." (Id.)  In his opinion, the

---

[5] Indeed, Mr. Nestor's report states as follows:

    The scope of my retention is to opine as to the
    payment of a day rate as compensation to employees and
    how such method of compensation is a prevalent
    industry practice and an industry standard in the oil
    and gas industry.

(Nestor Report ¶ 3.)

Secretary's overtime calculation contains basic computational errors and fails to account for a variety of mitigating factors, (See id. ¶¶ 9-10; see also ¶¶ 13-17), rendering the Secretary's calculation "incorrect and arbitrary," (id. ¶ 22).  Mr. Highlander offers four separate overtime calculations of his own, which vary based upon potential conclusions regarding employee exemptions and the availability of credits against overtime due.  (Id. ¶ 19.)  Additionally, he asserts that "certain employees" were paid for some hours during which they did not work.  (Id. ¶¶ 21-22.)  The Secretary raises a litany of objections to the admissibility of Mr. Highlander's report and potential testimony.

First, the Secretary contends that Mr. Highlander is unqualified to calculate the amount of overtime allegedly owed pursuant to the FLSA.  (Mem. Supp. Exclude Highlander 9.)  The court disagrees.  Mr. Highlander earned a bachelor's degree in accounting from West Virginia University Institute of Technology, is a certified public accountant, and has over fifteen years' experience in the field.  (Id. Ex. D, Highlander Curriculum Vitae.)  Despite his background, the Secretary emphasizes Mr. Highlander's unfamiliarity with the FLSA, arguing that it exhibits a lack of the "specialized knowledge about the

FLSA and [its] interpretation" necessary to be an expert on the computation of damages thereunder. (Id. 10.)

Rule 702 is not, however, as demanding as the Secretary claims: an expert need only have "sufficient knowledge to assist the [trier of fact] in deciding the particular issues in the case." Belk, 526 U.S. at 162 (quoting Kumho Tire, 526 U.S. at 156). The Secretary "provides no support for its argument that [computation of damages under the FLSA] is sui generis such that an expert's lack of experience in [calculating] these specific [damages] necessarily disqualifies him from giving an expert opinion." Id. Certainly, performing the algebra here is not so esoteric that an experienced certified public accountant is not qualified to be of assistance to the trier of fact.

Second, in a similar vein, the Secretary argues that the amount of overtime allegedly due is "straightforward and easily understood without the Highlander Report and testimony." (Mem. Supp. Exclude Highlander 6-7.) The Secretary notes that the FLSA and its implementing regulations instruct triers of fact on the computation of damages, rendering Mr. Highlander's report and potential testimony unnecessary since the trier of fact can simply compute damages itself. (Id. 8-9; Reply Supp. Exclude Highlander 12-13.) Team responds that Mr. Highlander's

report and potential testimony "will aid the court in proving or disproving the core issue of fact in this matter – Team's total liability, if any." (Mem. Opp'n Exclude Highlander 8-9.)

The court finds that, despite the FLSA's instructions, the trier of fact will find Mr. Highlander's report and potential testimony necessary to accurately understand key issues in the case. Namely, Mr. Highlander can be helpful because he explains Team's position on damages; shows potential computational errors in the Secretary's calculation of damages; can translate Team's payroll data into a digestible format; and, along with the Secretary, can serve as a useful reference point for the trier of fact's own determination of damages. Accordingly, Mr. Highlander's "specialized knowledge will help the trier of fact . . . to determine a fact in issue." Fed. R. Evid. 702(a).

Third, the Secretary challenges that Mr. Highlander's report and potential testimony purport to make legal conclusions. (See Mem. Supp. Exclude Highlander 7, 12-14; Reply Supp. Exclude Highlander 2-9.) The Secretary emphasizes paragraph eight of Mr. Highlander's report, aptly claiming that it expressly states a legal conclusion:

> Upon information and belief, certain employees listed
> in Amended Exhibit A of the Amended Complaint meet
> exempt status under the [FLSA]. I am of the opinion

> that those employees listed in Amended Exhibit A of
> the Amended Complaint found to meet exempt status
> under the [FLSA] are not entitled to any additional
> monies as overtime or compensation for work previously
> performed on behalf of Team.

(Highlander Report ¶ 8.)

More broadly, the Secretary asserts that Mr.
Highlander's calculations are thinly-veiled legal conclusions
disguised as mere mathematical disagreements.  (Mem. Supp.
Exclude Highlander 12-14; Reply Supp. Exclude Highlander 2-7.)
For example, Mr. Highlander reports that the Secretary's damages
calculation "failed to consider the amounts paid to the affected
employees . . . for purposes of calculating overtime due," and
he adjusts his calculation of damages to reflect that purported
error.  (See id.)  The Secretary insists that such calculation,
even if computationally correct, is impermissibly based upon the
legal conclusion that certain payments to employees can be
credited against Team's overtime owed.  (Reply Supp. Exclude
Highlander 6.)  Team apparently agrees but responds that Mr.
Highlander's report and related testimony are nevertheless
helpful since he provides four separate overtime calculations
that vary along a handful of potential legal conclusions
advanced by Team, thus mitigating the risk of Mr. Highlander
assuming the role of trier of fact.  (See Resp. Opp'n Exclude
Highlander 11-14.)

Indeed, Mr. Highlander straddles the line of helpfulness. Using paragraph fifteen as a reference, Mr. Highlander's report plainly usurps the role of the trier of fact to the extent that he concludes Team is entitled to credits against potential damages. See generally 29 U.S.C. § 207(h)(2) (describing categories of payments "creditable toward overtime compensation payable" as damages). But that paragraph and related testimony are simultaneously helpful for reasons earlier stated, such as associating calculations with Team's theory of damages.

Accordingly, the court does not find helpful and will afford no weight to those portions of Mr. Highlander's report and related testimony that command a finding of underlying legal conclusions.[6] However, Mr. Highlander's unhelpful testimony "does not necessarily banish him from the stand altogether, because his specialized knowledge may still assist the trier of fact in other ways." Kopf, 993 F.2d at 378. The court will admit Mr. Highlander's report and testimony to the extent that the court finds it helpful to the issues at hand as described herein. Proceeding in this fashion will adequately preserve

---

[6] Alternatively, Team requests that the court admit Mr. Highlander as a lay witness. (Resp. Opp'n Exclude Highlander 14.) Re-characterizing the inadmissible portions of Mr. Highlander's report and related testimony as lay testimony does not alter its conclusory nature.

31

Rule 702's primary policy goals: facilitating a just disposition while preserving the trier of fact's integrity in weighing the evidence.  See 29 Wright & Miller, supra, § 6262.

Last, the Secretary disputes the reliability of Mr. Highlander's opinions.  (Mem. Supp. Exclude Highlander 9-11.) On the contrary, Team correctly notes that Mr. Highlander's report and related testimony - as they pertain to the helpful portions - are founded in "commonly-accepted mathematical principles."  (Mem. Opp'n Exclude Highlander 10.)  Consequently, the court has no reason to doubt that Mr. Highlander's helpful opinions are sufficiently reliable.  The Secretary's issues here are better suited for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  Daubert, 509 U.S. at 596.

V. Conclusion

For the reasons stated above, the court ORDERS as follows:

1. that the Secretary's motion to exclude the expert report and testimony of Mr. Nestor be, and hereby is, granted;

32

2. that the Secretary's motion to exclude the expert report and testimony of Mr. Highlander be, and hereby is, granted in part and denied in part as set forth above;

3. that Team's motion to defer consideration of the Secretary's motion for partial summary judgment or, alternatively, to stay be, and hereby is, denied; and

4. that the Secretary's motion for partial summary judgment be, and hereby is, granted.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: December 29, 2017

John T. Copenhaver, Jr.
United States District Judge